<mark>FILED

SEP 5 - 2006

U.S. BANKRUPTCY COURT
FOR THE DISTRICT OF ARIZONA</mark>

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>JOHN J. GREENWOOD and MARSHA MARIE GREENWOOD,<br><br>          Debtors. | Chapter 7<br><br>No. 4-04-04447-EWH |
| JOHN J. GREENWOOD,<br><br>          Plaintiff,<br><br>vs.<br><br>EDUCATIONAL CREDIT MANAGEMENT CORPORATION,<br><br>          Defendant. | Adv. No. 05-00001<br><br>**MEMORANDUM DECISION**<br>(Opinion to Post) |

## INTRODUCTION

John J. Greenwood ("Greenwood" or "Debtor") is a married, mental health social worker with two children whose family's living expenses exceed his and his wife's income. He has no college degree and no realistic prospect of significant advancement in his employment or finding a better paying line of work. Until his children were born, he made regular payments on his student loan obligations or timely requested forebearance agreements. For the reasons set forth below, he is entitled to a discharge of his student loan obligations which now exceed $39,000.

## FACTS AND PROCEDURAL HISTORY

Greenwood is a 43-year old social worker and married father of two children under the age of ten. He attended college, but never received a degree. His current monthly net take-home pay is

<mark>Case 4:05-ap-00001-EWH    Doc 49    Filed 09/05/06    Entered 09/05/06 16:36:08    Desc
Main Document    Page 1 of 12</mark>

$1,855.08. His job does not provide the opportunity to work overtime. The mandatory deductions made from his pay include $106.42 for a retirement plan. His wife works 32-40 hours per week at an RV dealership. Her monthly net take-home pay is $1,061. The total monthly net family income of the Greenwoods is $2,916.08. Their monthly expenses total $2,965.01. The Greenwoods' income significantly increased between 2002 and 2004 ($18,541 in 2002, to $36,962.31 in 2003, to $47,775 in 2004), but dropped (to $43,457.50) in 2005 after Mr. Greenwood stopped working 70-80 hour workweeks.

The Greenwoods live in a manufactured home, located in a semi-rural part of Pima County. As part of a refinancing attempt, the home was appraised at $129,000. The Greenwoods' mortgage is $84,000. Due to their poor credit, the Greenwoods were unable to qualify for a refinancing. The Greenwoods are paying for two cars. A 1999 Buick Le Sabre will be paid off in 2007. A 2003 Pontiac Grand Am will be paid off in 2009. Because of where the Greenwoods' home is located and because Mr. Greenwood uses his car to visit clients, both cars have high mileage.

Mr. Greenwood began borrowing money to pay for his education in 1988. In 1992, he consolidated all of his obligations into one note ("Note") for $18,458.36 at 9% interest. He made payments on the Note between 1994 and 1998, totaling $9,612. After August of 1998, he quit making any payments, but timely requested deferments or forbearance agreements. Because unpaid interest continues to accrue during forbearance periods and is periodically capitalized into the principal, the amount of the Note continued to grow. As of April 16, 2006, the outstanding balance was $39,358.04. Interest accrues at the rate of $8.87 per day.

In an effort to increase his income, Greenwood started a building contracting business. When that business, which was undercapitalized, failed, Greenwood returned to the mental health field. He worked between 70 and 80 hours per week at two different jobs – one at the county hospital's mental health unit and one at a private mental hospital. During that time period, he began taking medication

2

for depression and stress. He still takes medication for depression. After the mental health unit at the county hospital closed, Mr. Greenwood took his present job and quit his second job.

Mr. Greenwood now works as a behavioral management specialist with Pima County's behavioral health agency. He enjoys his job and receives good evaluations but, because he is at or near the top of his pay grade, he is unlikely to see significant pay increases in the future beyond possible cost of living adjustments. He has applied for other jobs with the county, has used websites like Monster.com and looked in the classified ads in an effort to obtain a job with better pay and better chances for advancement. Those attempts have proved unsuccessful.

If Mr. Greenwood were to participate in the U.S. Department of Education's William D. Ford Federal Direct Loan Program ("Ford Program")[1], his minimum payment would be $260 a month. Outside of the Ford Program, regular payments on the Note would be $475 a month.

Mr. Greenwood filed a Chapter 7 petition on April 14, 2003. He filed a pro se adversary against Educational Credit Management Corporation ("ECMC"), seeking to discharge the student loan, on June 11, 2003. A trial was held on April 27, 2006.[2] Each side has submitted proposed findings of fact and conclusions of law. The matter is now ready for decision.

---

[1] The U.S. Department of Education offers four types of student loan repayment options, one of which is based on a borrower's income, the Income Contingent Repayment program. See 20 U.S.C. § 1078(m); 34 C.F.R. § 685.209.

[2] The Tucson division of the U.S. Bankruptcy Court for the District of Arizona has a Bankruptcy Pro Se Debtor Project in which law students from the James E. Rogers College of Law at the University of Arizona, assist experienced licensed bankruptcy attorneys in their pro bono representation of pro se debtors in non-dischargeability litigation. Mr. Greenwood was represented by the law students and an attorney volunteer from that Project.

3

Case 4:05-ap-00001-EWH    Doc 49    Filed 09/05/06    Entered 09/05/06 16:36:08    Desc
Main Document    Page 3 of 12

## ISSUE

Under § 523(a)(8), has the Debtor demonstrated that he is entitled to an undue hardship discharge of his student loans and the underlying obligation to pay the Note?[3]

## JURISDICTIONAL STATEMENT

Jurisdiction is proper under 28 U.S.C. §§ 1334(a) and 157(b)(2)(J).

## DISCUSSION

In deciding if excepting student debt from discharge will impose an undue hardship, the court must apply the three-part test enunciated in Brunner v. New York State Higher Education Service Corp. (In re Brunner), 831 F.2d 395, 396 (2nd Cir. 1987), which was adopted by the Ninth Circuit Court of Appeals in United Student Aid Funds, Inc. v. Pena (In re Pena), 155 B.R. F.3d 1108, 1112 (9th Cir. 1998). Under the Brunner test, a debtor must prove that: (1) he cannot maintain, based on current income and expenses, a "minimal" standard of living for himself and his dependents if forced to repay the loans; (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period; and (3) the debtor has made good faith efforts to repay the loans. Brunner, 831 F.2d at 396. The burden of proving undue hardship is on the Debtor, and the Debtor must prove all three elements before discharge can be granted. Rifino v. Sallie Mae et al (In re Rifino), 245 F.3d 1083, 1087-88 (9th Cir. 2001).

---

[3] Absent contrary indication, all chapter, section, and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330 and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036, in effect prior to the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. 109-8, 119 Stat. 23 (Apr. 20, 2005).

4

A. Applying the Brunner Test

   1. Minimal Standard of Living

The Greenwoods struggle every month to pay their bills. They are frequently behind on their utility bills. Mrs. Greenwood testified that she regularly borrows money from her sister between paychecks to make ends meet. The Greenwoods owe over $6,000 in property taxes on their home. ECMC argues that the Greenwoods' lifestyle exceeds a "minimal" standard of living because their income exceeds the federal poverty guidelines for their family size, and because the amounts they spend on utilities, cleaning expenses and prescriptions exceed the local chapter 13 trustee guidelines for monthly expenses ("Chapter 13 Guidelines").[4] According to ECMC, the Greenwoods should have available an additional $139.49 a month from which Mr. Greenwood could make payments on the Note.[5] ECMC also argues that if the Greenwoods eliminated their cable service, reduced their use of electricity and recreation expenses, there would be even more money available from which to make payments on the Note. ECMC, relying on this court's decision in In re Mendoza, 274 B.R. 522 (Bankr. D. Ariz. 2002), argues that the mandatory retirement contributions deducted from Mr. Greenwoods' paycheck must be considered additional income to the Greenwoods. ECMC also argues that the Greenwoods should be able to refinance their home to pay off the Note, that additional monthly income is available to them because they over-withhold for income taxes, and that once the Greenwoods pay off their cars, there will be more income from which payments could be made on the Note. None of ECMC's arguments are persuasive.

Debtors do not have to live at or below the official poverty guidelines to meet the first prong of the Brunner test. In re Howe, 319 B.R. 886, 889 (9th Cir. BAP 2005); In re Ammirafi, 187 B.R. 902,

---

[4] The Chapter 13 Guidelines are available from the Trustee's office and are attached as Exhibit 1 to this Memorandum Decision.

[5] The exact components of the $139.49 are not set out in ECMC's proposed findings of fact and conclusions of law.

5

906 (D. S.C. 1995) ("minimal standard of living" is not co-extensive with living at poverty level), aff'd 85 F.3d 615 (4th Cir. 1996). This court has looked to the Chapter 13 Guidelines in analyzing the reasonableness of expenses in § 523(a)(8) cases. Using the Chapter 13 Guidelines as a reference, the expenses for a family of the Greenwoods' size should be approximately $4,000 a month. The Greenwoods' overall expenses are almost $1,000 less than that amount. Where their expenses exceed the Chapter 13 Guidelines in some categories, the amounts are not large ($10 for laundry, $30 for prescriptions) or not reasonably within their control ($65 over the guidelines for electricity). A minimal standard of living for a family with school-age children can reasonably include basic cable, the only television service available in the rural areas of Pima County. It can also include internet access ($6.95 a month) and $25 a week for recreation. A review of the Greenwoods' expenses and the evidence, which demonstrated that they are chronically behind on paying bills for basics, such as utility services and real property taxes, indicates that the Greenwoods are not enjoying anything more than a minimal standard of living.

ECMC's reliance on <u>Mendoza</u>, to assert that the retirement contribution withheld from Mr. Greenwood's pay should be characterized as income, is misplaced. Mr. Greenwood testified that the retirement deduction is mandatory, something that was not clear in <u>Mendoza</u>, 274 B.R. at 525. Furthermore, the issue to be decided in a § 523(a)(8) analysis is not whether a debtor is devoting all disposable income to payments under a chapter 13 plan with a 3 to 5 year term, but whether a debtor can maintain a minimal standard of living and pay an outstanding student loan obligation for a 20 plus year term. As Greenwood's counsel correctly points out, if this court were to determine that the amounts deducted by Greenwood's employer should be added back into his income, it would not make it so.

ECMC claims, based on dividing the amount of the Greenwoods' last tax refund by 12, that the Greenwoods should have an additional $106.42 available monthly if they changed the amounts withheld from their paychecks for taxes. While the amount of tax refunds received by the

6

Greenwoods in five out of the last six years was income to them, the refunds were largely the result of their eligibility for earned income tax or child care credits, not over-withholding. Income tax credits only become available after they are claimed and allowed. See 26 U.S.C.A. § 32.

ECMC also argues that the amount of the Greenwoods' car payments should be considered additional income, once their cars are paid off. This assumption is without merit since cars are depreciating assets and few people will ever drive a single car for the rest of their lives. The assumption is especially misplaced in this case where the testimony indicated that, due to the rural area where the Greenwoods live and the requirement that Mr. Greenwood make home visits to his clients, the Greenwoods' cars have higher than average mileage and rarely last more than three or four years. Because the cars will probably have to be replaced, at, or even before, the cars are paid off, there is no basis to assume that the Greenwoods will not have to make car payments in the future.

ECMC's argument that the Greenwoods should refinance their home to pay off the Note is not supported by the facts. Due to their poor credit, the Greenwoods were unable to refinance their manufactured home. Even if they could refinance the manufactured home, there is not enough exempt equity to pay off the Note, given that the outstanding balance exceeds the refinanceable equity in the home.[6] If the Greenwoods could refinance their home to pay some of the Note, the amount of their mortgage payments would increase, but they have no excess income from which to make such a higher payment.

Because the Greenwoods' expenses fall generally within the Chapter 13 Guidelines, are reasonable and exceed their monthly expenses, Greenwood has demonstrated, by a preponderance of the evidence, that he cannot maintain a minimal standard of living for his family and make payments

---

[6] 80% of $129,000 = $103,000 - $84,000 existing mortgage = $19,000. When closing costs and other fees are included, then the amount realized by the Greenwoods would be far less than $19,000. The Note balance, however, is close to $40,000.

7

on the Note, even at the reduced amount of $260 a month, which is the lowest payment available under the Income Contingent Repayment option of the Ford Program.

2. <u>Additional Circumstances</u>

The second prong of <u>Brunner</u> requires that Greenwood demonstrate that "additional circumstances" exist indicating that his inability to maintain a minimal standard of living for his family and pay the Note is likely to persist for a significant portion of the repayment period. It is worth noting that at the time <u>Brunner</u> was decided, debtors could obtain a discharge of student loan debt if the debt "first became due before five years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition." § 523(a)(8)(A) (1988) (amended 1990 and repealed 1998). It has been suggested that the <u>Brunner</u> court "must have necessarily contemplated that a "significant portion" of the repayment period could not have exceeded five years. Rafael I. Pardo & Michelle R. Lacey, <u>Undue Hardship in the Bankruptcy Courts: An Empirical Assessment of the Discharge of Education Debt</u>, 74 U. Cin. L. Rev. 405 (2005). The presumptive repayment term under the Ford Program now exceeds 20 years. 34 C.F.R. § 685.209(c). Because the loan repayment period is so extended, courts are placed in the unenviable position of trying to predict what a debtor's circumstances will be for decades, not years.

In <u>Educ. Credit Mgmt. Corp v. Nys (In re Nys)</u>, 446 F.3d 938 (9th Cir. 2006), the Ninth Circuit Court of Appeals clarified what a debtor must demonstrate to satisfy the second prong of <u>Brunner</u>:

> [T]he burden is on the debtor to provide the court with additional circumstances, i.e. "circumstances, beyond the mere current inability to pay, that show that the inability to pay is likely to persist for a significant portion of the repayment period. The circumstances need be 'exceptional' only in the sense that they demonstrate insurmountable barriers to the debtors' financial recovery and ability to pay."

(quoting <u>In re Nys</u>, 308 B.R. 436, 444 (9th Cir. BAP 2004)). The Ninth Circuit Court then clarified that the terms "additional circumstances" or "exceptional circumstances" mean:

> [O]nly that the debtor must present something more than her current financial situation.....[S]he must present the court with circumstances that she cannot reasonably change. To prove "undue hardship," the circumstances must indicate that the debtor cannot

8

reasonably be expected to increase her income and make payments for a substantial portion of the loan's repayment period.

Nys, 308 B.R. at 444, n.7.

Under the holding of Nys, courts are to presume a debtor's income will increase to a point where payments can be made on a student loan obligation while the debtor maintains a minimal standard of living; however, a debtor may rebut the presumption. 446 F.3d at 946. In deciding if a debtor has overcome the presumption, courts may use the "unexhaustive" list of additional circumstances set forth by the Ninth Circuit BAP in its published decision.[7] Id.

In this case, a number of the factors in the Ninth Circuit BAP list are present. Greenwood never completed his education (factor 3); the Greenwoods' only asset – the equity in their home - is not currently accessible and is insufficient to pay off the Note (factor 10); Greenwood has unsuccessfully attempted other lines of work and has unsuccessfully applied for other jobs in an attempt to increase his income (factor 12). Perhaps most importantly, Greenwood has maximized his income potential in his chosen field and there are no better financial options elsewhere (factors 7 and 12). This is not a case where a debtor has obtained a professional (or any) degree and has then made lifestyle choices such as taking a low-paying or part-time job, which makes it impossible to make payments on

---

[7] The factors a court may consider include, but are not limited to:
(1) Serious mental or physical disability of the debtor or the debtor's dependents which prevents employment or advancement;
(2) The debtor's obligations to care for dependents;
(3) Lack of, or severely limited education;
(4) Poor quality of education;
(5) Lack of usable or marketable job skills;
(6) Underemployment;
(7) Maximized income potential in the chosen educational field, and no other more lucrative job skills;
(8) Limited number of years remaining in [the debtor's] work life to allow payment of the loan;
(9) Age or other factors that prevent retraining or relocation as a means for payment of the loan;
(10) Lack of assets, whether or not exempt, which could be used to pay the loan;
(11) Potentially increasing expenses that outweigh any potential appreciation in the value of the debtor's assets and/or likely increases in the debtor's income;
(12) Lack of better financial options elsewhere.

outstanding student loan obligation. See e.g. Holtorf v. Educ. Credit Mgmt Corp (In re Holtorf), 204 B.R. 567 (Bankr. S.D. Cal. 1997) (debtor was not entitled to hardship discharge, despite claims he suffered from depression and drug addiction, where debtor did not attempt to make best use of his medical professional training and license, and instead worked 20 hours a week at minimum wage job). Greenwood falls into that category of individuals whose educations do not permit them to earn substantially greater income over their working lives. As the court noted in Nys:

> [W]e cannot say that a debtor who, in good faith, chooses a certain field but ultimately cannot increase her income to a point that allows her to repay her student loans, is foreclosed from seeking a discharge.

446 F.3d at 945, n.6.

In this case, Greenwood has successfully demonstrated that additional circumstances exist to rebut the presumption that his income will increase to a point in the future where it will be possible for him to make payments on the Note and maintain a minimal standard of living for himself and his family. Accordingly, he has satisfied the second prong of Brunner.

3. Good Faith

Between 1994 and 1998, Greenwood paid over $9,000 on the Note. When he did not make payment, he timely requested forbearance or deferral agreements. ECMC, relying on Pa. Higher Educ. Assist. Agency v. Birrane (In re Birrane), 287 B.R. 490 (9th Cir. BAP 2002), argues that Greenwood cannot satisfy the good-faith prong of Brunner because he refused to take any steps towards renegotiating his student loans under the Ford Program. However, the record indicates that Greenwood and his counsel did have discussions with ECMC about the Ford Program. However, the lowest payment available under that program is $260 a month, an amount which the Greenwoods cannot pay. Where the Ford Program offers no effective relief, failure to participate in it cannot be considered to be an indication of lack of good faith. Cota v. U.S. Dept. Of Education, et al. (In re Cota), 298 B.R. 408, 420 (Bankr. D. Ariz. 2003). Furthermore, a willingness to participate in a repayment program, while an important indicator of good faith, is not required to satisfy the good-

faith prong of the Brunner test. Nys, 446 F.3d at 947 (citing Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete), 412 F.3d 1200, 1206 (10th Cir. 2005)). In this case, the Ford Program is not a viable option given the amount of the minimum payment. By making payments when he could, by timely requesting deferrals and forebearances, by attempting to maximize his income and minimize his family's expenses, Mr. Greenwood has satisfied the third prong of the Brunner test.

4.  Partial Discharge

In the Ninth Circuit, once a debtor has established undue hardship, the court may consider partially discharging the debt if the record indicates that a debtor has the ability to pay a portion of the debt. See Saxman v. Educ. Credit Mgmt. Corp. (In re Saxman), 325 F.3d 1168, 1175 (9th Cir. 2003). There has not been a request by ECMC for the court to consider whether a partial discharge should be granted. Indeed, given the testimony of ECMC's witness about the many administrative headaches created for ECMC and the Department of Education when courts enter partial discharges, it may be that ECMC will not seek a partial discharge in this case. However, even if ECMC were to make the request, it would not be granted. This court has determined that only the first prong of Brunner is relevant to a partial discharge determination. In re Bossardet, 336 B.R. 451, 458 (Bankr. D. Ariz. 2005). In this case, the Greenwoods' expenses have been found to be reasonable and to exceed their income. Accordingly, there are currently no excess funds available to Greenwood to make payments on the Note. Therefore, there is no basis for the entry of a partial discharge.

## CONCLUSION

Greenwood has satisfied all three prongs of the Brunner test. Accordingly, a judgment will be entered this date in Debtor's favor on the complaint. The foregoing constitute the court's findings of fact and conclusions of law as required by Fed. R. Bankr. P. 7052.

DATED: September 5, 2006

*[signature: Eileen W. Hollowell]*

EILEEN W. HOLLOWELL
UNITED STATES BANKRUPTCY JUDGE

COPIES served as indicated below
this 5 day of September, 2006, upon:

Kasey C. Nye - knye@quarles.com
Quarles & Brady Streich Lang
One South Church Street, Suite 1700
Tucson, AZ 85701-1621
Attorneys for Plaintiff John J. Greenwood

Madeleine C. Wanslee - mwanslee@gustlaw.com
Raul Abad - rabad@gustlaw.com
Gust Rosenfeld P.L.C.
201 East Washington, Suite 800
Phoenix, AZ 85004-2327
Attorneys for Defendant Educational Credit Management Corp.

By _____
     Judicial Assistant